# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 23, 2010

## STATE OF TENNESSEE v. ANTHONY W. HUTCHINSON

**Appeal from the Circuit Court for Blount County**
**No. C-17338      Jon Kerry Blackwood, Senior Judge**

**No. E2010-01053-CCA-R3-CD - Filed April 25, 2011**

The Defendant, Anthony W. Hutchinson, was convicted of one count of theft of property valued at $1,000 or more, a Class D felony.  See Tenn. Code Ann. §§ 39-14-103, 105.  In this appeal as of right, the Defendant contends that (1) the evidence was insufficient to sustain his conviction and (2) the trial court erred by denying alternative sentencing.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

D. KELLY THOMAS, JR. J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Raymond Mack Garner, District Public Defender (at trial); and J. Liddell Kirk, Knoxville, Tennessee (on appeal), for the appellant, Anthony W. Hutchinson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Clinton E. Frazier, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The victim, Dennis R. Webb, testified that in August 2007, he was looking for a contractor to put a metal roof on his garage.  Mr. Webb's son-in-law, Aaron Bruno, suggested that Mr. Webb contact the Defendant about the job.  Mr. Webb already had an estimate for $6,500, but Mr. Bruno told Mr. Webb that the Defendant would "do it cheaper."  After speaking with Mr. Bruno, Mr. Webb agreed to let the Defendant give him an estimate on the job.  The next day, the Defendant and Mr. Bruno went to Mr. Webb's house and took some measurements.  The Defendant told Mr. Webb that he could do the job for $5,300 with

$3,000 paid up front and the remainder to be paid after completion of the job. The Defendant said that he would order the metal and start the job on August 13th and have the job finished on August 15th. Mr. Webb asked the Defendant if he was sure he could complete the job so quickly. The Defendant responded that he did not have any other jobs and that he needed the money.

The next day, August 9, 2007, the Defendant brought a contract to Mr. Webb's house for him to sign. The contract listed the estimated start date as August 13th and the estimated completion date as August 15th. The contract also provided that a deposit of $3,000 would be paid with $2,300 to be paid upon completion. Mr. Webb testified that after signing the contract he gave the Defendant $3,000 in a First National Bank envelope. After August 9th, the Defendant never returned to Mr. Webb's home to perform the job. Mr. Webb testified that he tried "10 or 12 times" to contact the Defendant by phone, but the Defendant would not answer. After about a month, Mr. Webb contacted the Blount County Sheriff's Office (BCSO).

Shortly after contacting the BCSO, Mr. Webb received a phone call from the Defendant. Mr. Webb testified that the Defendant told him, "I ain't got the money" and that "[i]f you take me to court, the [j]udge will just make me pay $15 a month." According to Mr. Webb, the Defendant told him there was nothing the police could do because "it was a civil case" and that the Defendant had "been doing this stuff before." Mr. Webb also testified that the Defendant "wanted [Mr. Webb] to meet him out on the road somewhere to fight to get over it." Mr. Webb denied being angry at the Defendant or threatening to hurt the Defendant. However, Mr. Webb admitted he was upset and aggravated about the situation. Mr. Webb also testified that he would have dropped his complaint with the police if the Defendant had agreed to come and do the job. However, Mr. Webb testified that during the phone conversation, the Defendant never offered to actually perform the work or return the money.

Mr. Bruno testified that he was "old friends" with the Defendant and that in August 2007, the Defendant asked Mr. Bruno to refer him to Mr. Webb. Mr. Bruno testified that the Defendant had no other jobs he was working on at that time. Mr. Bruno also testified that he went with the Defendant to measure the roof and that he was present when the contract was signed. According to Mr. Bruno, the Defendant later told him that he had a year to do the job and that his failure to do the job was a civil matter. On cross-examination, Mr. Bruno again testified that he was present when the contract was signed but that after the contract was signed, the Defendant left and came back later to pick up the money "in an envelope."

Lisa Regan testified that she is Mr. Webb's niece and that in August 2007, she was dating the Defendant. According to Ms. Regan, on August 9, 2007, the Defendant called her and asked her to go with him to Harrah's Casino. Shortly after they arrived, the Defendant

began gambling and "pulled out a few hundred dollar bills out of his wallet." Ms. Regan testified that "[a]fter [the Defendant] lost all the money that was in his wallet, he pulled out a bank envelope" and took money from that. According to Ms. Regan, the Defendant gambled all night long. Ms. Regan eventually went up to her room and fell asleep, when she woke up the next morning the Defendant "was still at a table gambling." The Defendant "had lost everything that he had brought there."

Ms. Regan testified that the Defendant eventually told her "he messed up." Ms. Regan asked the Defendant if he had gambled away Mr. Webb's money, and he responded that he would never "admit to them that [he] lost the money." Ms. Regan offered to loan him the money if he would let her go with him and pay for the materials. The Defendant "would [not] agree to that" and "said he would look stupid if [Ms. Regan] went with him to pay for the material, that if [she] couldn't just give him the money and him go pay for it [himself], to forget it." Shortly after this conversation, Ms. Regan ended her relationship with the Defendant. Ms. Regan also testified that in August 2007, the Defendant did not have any other contracts. In fact, Ms. Regan recalled that during this time the Defendant was looking for work in the "want ads."

Deputy James Wilson of the BCSO testified that Mr. Webb contacted his office on September 10, 2007. After taking a statement from Mr. Webb, Deputy Wilson contacted the Defendant. The Defendant told Deputy Wilson that this was a civil matter and that he had two years to perform the work. The Defendant admitted that he had not done any work and had not bought any supplies. However, the Defendant told Deputy Wilson that the money was not for supplies. Instead, the Defendant claimed that the money "was to secure [the Defendant's] . . . position to do the work, so another contractor could [not] come in and do the work." Deputy Wilson tried to resolve the situation by convincing the Defendant "to go ahead and perform the contract." However, the Defendant told Deputy Wilson that "he was extremely busy . . . [and] had three contracts that he was under at the time." Deputy Wilson testified that the Defendant gave him "the impression [that the Defendant] was so busy that he did [not] have time to get to Mr. Webb's work at the time." The Defendant told Deputy Wilson that he was "in Georgia at the time working on another job and was just very busy." Deputy Wilson testified that to his knowledge, the Defendant never performed the contract or repaid Mr. Webb.

After speaking with the Defendant, Deputy Wilson subpoenaed the Defendant's gambling records from Harrah's Casino. The records show that on August 9, 2007, the Defendant gambled for 541 minutes and lost $1,200. The records for August 10, 2007 reflect that the Defendant lost $1,750 during 77 minutes of gambling. Deputy Wilson testified that the records for August 8, 2007 reflect that the Defendant lost $1,200 the day before he and Mr. Webb signed the contract. On cross-examination, Deputy Wilson admitted that the

Defendant had gambled at Harrah's Casino on numerous occasions prior to and after August 9, 2007. Based on the foregoing evidence the jury convicted the Defendant of theft of property valued at $1,000 or more, a Class D felony. See Tenn. Code Ann. §§ 39-14-103, 105.

At the sentencing hearing, the State introduced copies of the Defendant's prior convictions in state and federal court as well as the Defendant's presentence report. In 1999, the Defendant pled guilty in federal court to four counts of entering a motor vehicle in a National Park with the intent to commit a theft, using stolen credit and check cards with the intent to defraud, and scheming to defraud a bank by using stolen blank checks and forging the signature of the endorser. In October 2003, a federal probation violation warrant was issued against the Defendant. The Defendant also had state convictions for theft over $1,000, conspiracy to pass worthless checks over $1,000, and two convictions for forgery. The Defendant was placed on community corrections for these charges and was on community corrections at the time of this offense. The State also introduced evidence that the Defendant had violated his community corrections sentence and had additional prior convictions for disorderly conduct and possession of drug paraphernalia.

The Defendant testified at the sentencing hearing that he was 30 years old and had two children, one of whom he had custody of. The Defendant claimed that he had ordered the metal needed to perform the job on Mr. Webb's roof but that it had come in "like a baby poop green" so he had to reorder the metal. The Defendant testified that he called Mr. Webb to inform him of this, but Mr. Webb said, "when I see you I'm going to punch you in the mouth" and yelled at him. According to the Defendant, he never performed the job because he could not risk having "an angry homeowner come kick a ladder out from one of [his] employees or [himself.]" The Defendant denied taking Mr. Webb's money to the casino and stated that he did not perform the job because Mr. Webb "did [not] act in a business disposition." The Defendant denied that at the time he signed the contract it was his intent to take Mr. Webb's money without performing the job.

The Defendant blamed his conviction for conspiracy to pass worthless checks on his girlfriend at the time. He testified that she had written the checks and that he had "got in the mix because [he] was dating her." The Defendant also blamed his federal convictions on someone else, claiming that he "was [not] the one doing the breaking into cars" but was "just doing the checks." Despite having failed to comply with the conditions of his federal probation and state community corrections sentences, the Defendant testified that if placed on alternative sentencing in this case he would comply with the conditions of his sentence. The Defendant continued to maintain his innocence, testifying that "[his] deposit is [his] deposit" and that the contract did not specify what the money was to be used for. However, when asked whether he had been honest with Deputy Wilson, the Defendant said "I don't

know. I sell metal roofing, brother; I'm not always honest." After cross-examination, the Defendant was asked by the trial court why, given the Defendant's indigency, he was able to pay $5,000 to make bond but not repay his $3,000 debt. The Defendant responded that a friend paid his bond.

The trial court concluded that the Defendant was a Range II, multiple offender. The trial court also concluded that the following enhancement factors applied to this case: (1) in addition to the prior convictions necessary to establish the appropriate range, the Defendant had a previous history of criminal convictions; (8) the Defendant failed to comply with the conditions of a sentence involving release into the community; and (13) at the time of the offense the Defendant was on community corrections. Tenn. Code Ann. § 40-35-114. The trial court concluded that these enhancement factors outweighed the sole mitigating factor that the Defendant's conduct neither caused nor threatened serious bodily injury. The trial court also concluded that the Defendant should be denied alternative sentencing based upon his prior criminal record, his failure to comply with the terms of alternative sentencing in the past, and the fact that less restrictive measures have been unsuccessfully applied to the Defendant. Accordingly, the trial court sentenced the Defendant to eight years to be served in the Tennessee Department of Correction.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for theft of property valued at $1,000 or more. The Defendant argues that his "subsequently behaving irresponsibly with the money does [not] itself amount to an intent to deceive the victim at the time the money was obtained." The State responds that intent to deprive an owner of property may be established by circumstantial evidence. The State argues that the evidence that the Defendant immediately took Mr. Webb's money to a casino where he gambled it away, his refusal to accept Ms. Regan's offer to buy materials for the job, his avoidance of Mr. Webb, and his claims to Deputy Wilson that he was busy was sufficient evidence for a reasonable jury to conclude the Defendant intended to deprive Mr. Webb of his money.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of

the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In Tennessee, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. In order to obtain a theft conviction, the State must establish that "(1) the defendant knowingly obtained or exercised control over property; (2) the defendant did not have the owner's effective consent; and (3) the defendant intended to deprive the owner of the property." State v. Amanns, 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999). Consent induced by deception is not effective. Tenn. Code Ann. § 39-11-106(a)(6)(A). Intent to deprive an owner of property may be established by circumstantial evidence. See State v. Scales, 524 S.W.2d 929, 931 (Tenn. 1975). Stated another way, a "jury may infer a criminal defendant's intent from the surrounding facts and circumstances." State v. Roberts, 943 S.W.2d 403, 410 (Tenn Crim. App. 1996), overruled on other grounds by State v. Ralph, 6 S.W.3d 251 (Tenn. 1999).

Situations involving alleged fraud in connection with home repairs or installations present a unique challenge under the theft statute. In Amanns, a panel of this court concluded that a contractor's failure to repay a $6,000 deposit did not constitute the crime of theft. 2 S.W.3d at 242. The defendant in Amanns entered into a contract to remodel the alleged victim's basement. Id. The terms of the contract provided that the alleged victim would pay a $6,000 deposit. Id. The defendant cashed the check the next day and used a portion of the money to establish an account with a material supplier. Id. at 242-43. The defendant began work at the agreed upon time and continued to work until a dispute arose over the quality of the defendant's work. Id. at 243. This court concluded that "[w]hile these facts establish a breach of contract, they fall far short of establishing . . . any intent to defraud." Id. at 245.

The facts in the present case differ greatly from those in Amanns. There was nothing in Amanns to suggest that the defendant never intended to complete the work when he took the alleged victim's deposit. However, in this case the Defendant never bought supplies or began work on Mr. Webb's roof. Instead, the evidence at trial established that on August 9,

2007, the Defendant was given $3,000 by Mr. Webb in a bank envelope. The Defendant then took Ms. Regan to Harrah's Casino, where he gambled using money from a bank envelope and lost approximately $3,000. Ms. Regan testified that the Defendant later admitted that the money was Mr. Webb's. The Defendant rejected Ms. Regan's offer to buy the supplies needed to complete the job. The Defendant avoided Mr. Webb and only spoke to him after the police had been contacted. When the Defendant spoke to Mr. Webb, he told him that he did not have his money and, essentially, that he would never get it back. Additionally, the Defendant lied to Deputy Wilson about what the money was for and why he had not begun work on Mr. Webb's roof. Accordingly, we conclude that the State produced sufficient evidence that the Defendant intended to deprive Mr. Webb of $3,000 when he took the money from Mr. Webb.

*II. Sentencing*

The Defendant contends that the trial court erred by denying him alternative sentencing. The Defendant argues that the trial court failed to "articulate due consideration for whether a sentence of confinement was deserved under the circumstances." Additionally the Defendant contends that there is nothing in the record to suggest "that he is such a danger or a threat that full confinement is necessary. The State responds that the trial court was correct in ordering the Defendant's sentence served in confinement. The State argues that the trial court's decision is justified based on the Defendant's significant criminal history and the fact that the Defendant's alternative sentences have been revoked on two occasions.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review:

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated

and balanced in determining the sentence. Tenn. Code Ann. § 40-35-210(f)
(1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the potential for rehabilitation or treatment, and (8) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn.1986).

The Defendant was eligible for probation because the "sentence actually imposed upon [him was] ten (10) years or less." Tenn. Code Ann. § 40-35-303(b). The Defendant was convicted of a Class D felony but was not presumed to be a favorable candidate for alternative sentencing because he was classified as a Range II, multiple offender. Tenn. Code Ann. § 40-35-102(6). No criminal defendant is automatically entitled to probation as a matter of law. State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). The defendant must establish his suitability for alternative sentencing. Tenn. Code Ann. § 40-35-303(b). In determining a defendant's suitability for alternative sentencing, the trial court should consider whether (1) confinement is needed to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is needed to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses, or (3) less restrictive measures than confinement have frequently or recently been applied unsuccessfully to the defendant. Ashby, 823 S.W.2d at 169 (citing Tenn. Code Ann. § 40-35-103(1)(A)-(C)). A trial court should also consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. Tenn. Code. Ann. § 40-35-103(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996).

The Defendant is mistaken in his assertion that the trial court failed to "articulate due consideration for whether a sentence of confinement was deserved under the circumstances." The trial court denied alternative sentencing on the basis of the Defendant's significant criminal history, the fact that the Defendant had failed to comply with the conditions of alternative sentencing in the past, and the fact that less restrictive measures have been unsuccessfully applied to the Defendant. The evidence at trial showed that the Defendant committed this offense with the belief that he could get away with it. Additionally, in

determining the length of the Defendant's sentence, the trial court gave little weight to the mitigating factor that no one was harmed by the Defendant's actions. While the Defendant testified at the sentencing hearing that he would comply with the conditions of an alternative sentence, he already had two alternative sentences revoked and testified that he is "not always honest." Accordingly, we conclude that the trial court did not err in denying the Defendant alternative sentencing.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE